IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DARRYL LYNN DIXON, #161637,      )
                                 )
            Plaintiff,           )
                                 )
    v.                           )        CIVIL ACTION NO. 2:20-CV-248-WHA
                                 )
KAY IVEY, *et al.*,              )
                                 )
            Defendants.          )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION[1]

Darryl Lynn Dixon, a state inmate proceeding *pro se*, filed this 42 U.S.C. § 1983

action challenging the constitutionality of conditions at the Red Eagle Honor Farm ("Red

Eagle").[2]  Specifically, Dixon contends the conditions at Red Eagle are hazardous to his

health due to the coronavirus pandemic, otherwise known as COVID-19, and his potential

risk of exposure to the virus while incarcerated.  Doc. 1 at 10 ("Being subjected to 'places

_____

[1] All documents and attendant page numbers cited in this Recommendation are those assigned by the Clerk in the docketing process.

[2] Dixon is currently incarcerated on three convictions for first degree robbery entered against him in 2009 and the concurrent twenty year sentences imposed upon him for these convictions by the circuit courts of Shelby and Jefferson counties.  The court obtained this information from the public records of the Alabama Department of Corrections and the case action summaries of these state courts maintained by the Alabama Trial Court System (hosted, respectively, at http://www.doc.state.al.us/inmatehistory and www.alacourt.com).  As permitted by applicable federal law, the court takes judicial notice of these records.  *See Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) ("We take judicial notice of [the state's] Online Judicial System.") (citing Fed. R. Evid. 201) (providing that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.")); *see also Coney v. Smith*, 738 F.2d 1199, 1200 (11th Cir. 1984).

where people are forced to be in close proximity' which 'are breeding grounds for the virus' which could possibly lead to death of inmates within the walls and confinement of the Alabama Department of Corrections is cruel and unusual."). Dixon further alleges the defendants have acted with deliberate indifference to his health and safety during the pandemic because they have not fully undertaken the measures recommended by health officials to stem the spread of the highly contagious virus and cannot do so in the prison environment. Doc. 1 at 12–13 ("Inmates incarcerated within the confines of the facilities of the Alabama Department of Corrections are unwillingly restricted from adhering to the warnings, mandates, orders, etc. imposed upon or recommended to the public [by various health officials] to protect us from the substantial harm and possible death from COVID-19."). In support of his allegations, Dixon references the fact that inmates are "'forced to be in close proximity' within the confinement of the Alabama Department of Corrections[.]" Doc. 1 at 13–14.

Dixon demands relief because he is "subjected to the possibility of contracting the potentially deadly virus known as COVID-19 otherwise 'coronavirus'." Doc. 1 at 13. Dixon seeks a declaratory judgment, both preliminary and permanent injunctive relief directing the immediate mass release of inmates who meet any one of numerous criteria he has identified in the complaint as warranting release, the costs of this suit and other relief the court deems appropriate. Doc. 1 at 14–17. In addition to requiring a response to the complaint, the court also entered an order directing the necessary defendants to file a response to the request for issuance of a preliminary injunction and they have done so.

2

Upon consideration of the motion for preliminary injunction and after thorough review of the response thereto filed by defendants Kay Ivey, Charles Tipton and Jefferson S. Dunn, the undersigned finds that such motion is due to be denied.

## II.  DISCUSSION

### A.  COVID-19

In accord with the United States District Court for the Northern District of Alabama, this court likewise observes that

> Judge Wood of the Southern District of Georgia summarized accurately and succinctly the background of the COVID-19 pandemic facing our nation. Her description is consistent with the parties' submissions.

> > The first outbreak of the virus causing COVID-19 is believed to have originated in late 2019 in Wuhan, China. Within months, the World Health Organization ("WHO") declared COVID-19 to be a pandemic. In February 2020, community transmission of Coronavirus was detected in the United States.  Since then, the virus has continued to spread rapidly, infecting hundreds of thousands of people in this country as of the writing of this opinion.[3]

> > To date, there is no known vaccine to protect against COVID-19, nor is there an antiviral treatment for those who are infected.  Instead, the most effective approach to minimizing fallout from the disease is to stay clean and to avoid contact with others. Specifically, the CDC recommends, inter alia, frequent handwashing, avoiding close contact with others, using face coverings while in public, and cleaning and disinfecting frequently touched surfaces.

> > Symptoms from exposure to Coronavirus range from mild cold-like symptoms to severe respiratory distress and even death. Though relatively little is known about the risk factors for COVID-19, preliminary data suggests that older adults and individuals with certain underlying medical conditions are most susceptible to developing serious medical complications from the infection.

---

[3] As of the date of this Recommendation, the virus has infected over two million people in the United States.

> Conditions that might increase the risk of death or permanent injury from COVID-19 include, but are not limited to, chronic lung disease, severe obesity, diabetes, liver disease, serious heart conditions, and other conditions that comprise the immune system, such as HIV or AIDS.
>
> *Benavides v. Gartland*, 2020 WL 1914916 *1–2 (S.D. Ga. April 18, 2020) (footnotes omitted)

*Archilla v. Witte*, 2020 WL 2513648, at *2 (N.D. Ala. May 15, 2020) (footnote added).

As recently stated by the Eleventh Circuit,

> [i]t would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects. It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases. The virus, though, poses particularly acute challenges for the administration of the country's jails and prisons. Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable. And for their part, prison officials are faced with the unenviable (and often thankless) task of maintaining institutional order and security while simultaneously taking proper care of the individuals in their custody.

*Swain v. Junior*, —— F.3d ——, 2020 WL 3167628, *1 (11th Cir. June 15, 2020).

## B.  Response to COVID-19 by the Centers for Disease Control and Prevention

On March 23, 2020, the United States Centers for Disease Control and Prevention ("CDC") issued its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correction and Detention Facilities" in response to the COVID-19 pandemic.  *See* Doc. 29-1 at 11–37.  "In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that a number of steps be taken at [such] facilities, including but not limited to: (1) restricting or suspending the

transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases." *Archilla*, 2020 WL at 2513648, at *3 (N.D. Ala. May 15, 2020).

## C.  Response to COVID-19 by the Alabama Department of Corrections

Ruth Naglich, the Associate Commissioner for Health Services for the Alabama Department of Corrections ("ADOC") and the person responsible for supervision of the individuals employed in the Office of Health Services ("OHS"), provided a detailed affidavit explaining the efforts undertaken by correctional and medical officials in an effort to prevent or mitigate the introduction and spread of COVID-19 in the state's correctional facilities.  In this affidavit, she provides the following information:

> The individuals employed in ADOC's OHS, including me, monitor the overall delivery of medical and mental-health care to inmates within ADOC facilities by its private healthcare contractor, Wexford Health Sources, Inc. ("Wexford"); adopting and/or enacting administrative policies and procedures related to the medical and mental-health care delivery system within ADOC facilities; overseeing ADOC's compliance with legal  and administrative requirements pertaining to medical and mental-health care such as activities during intake and housing of new and existing inmates; and monitoring the budgetary and financial aspects of the medical and mental-health care system within the ADOC facilities.

During the pandemic associated with COVID-19, ADOC's OHS, including me, has been focused on the most widely accepted and known methods to reasonably prevent the introduction and spread of COVID-19. These methods include information published by the Centers for Disease Control and Prevention, an operating division of the U.S. Department of Health and Human Services ("CDC"), specifically, the "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-2019) in Correctional and Detention Centers" (the "CDC Guidance") on March 23, 2020, containing guiding principles for federal and state prisons, local jails, and detention centers in response to the threat posed by COVID-19. A true and correct copy of the CDC Guidance is attached as **Exhibit 1** . . . . Even before the CDC Guidance, CDC provided general recommendations on preventing the spread of COVID-19 and management of persons testing positive for COVID-19. Nevertheless, ADOC used the general CDC guidance and the specific CDC Guidance to develop its prevention and management plan for COVID-19.

OHS's efforts have focused on (among other things) operational preparedness, prevention of the spread of COVID-19 through reinforcing hygiene practices, cleaning and disinfection of facilities, screening for symptoms among staff and inmates, communication among correctional, administrative, medical, and mental-health staff, social distancing, restriction of movement and cessation of new intakes, visitors, and non-essential persons into the facilities, securing hygiene, cleaning, and medical supplies (including personal protective equipment ["PPE"]), infection control, and strategies to manage confirmed or suspected COVID-19 cases.

In early March 2020, ADOC began planning for COVID-19. ADOC and Wexford formed Pandemic Planning Teams, at a facility level, comprised of a Warden, Health Service Administrator, OHS Regional Associate Director of Health Services, facility Medical Director, and other persons based on the scope of a facility's operations such as the Facility Food Service Manager and Facility Maintenance. For COVID-19 planning at a facility level, OHS provided a checklist to ensure the facility Pandemic Planning Team completed tasks in preparation for COVID-19, including, for example, evaluating correctional and medical staff, evaluating locations to quarantine an inmate or cohort of inmates, evaluating supplies of PPE, soap, paper towels, and disinfectants, evaluate food supply, and educating staff and inmates regarding signs and symptoms of COVID-19. Additionally, ADOC's OHS developed a clinical management plan for use across the system. This plan included prevention and management strategies based upon the response stage from phase 1 to phase 5.

ADOC proactively prepares for the prevention of various infectious diseases through its intake process, but a global pandemic of this magnitude

is entirely different and unprecedented in recent history. The circumstances are certainly unprecedented in terms of my [lengthy] tenure with ADOC. For this reason, ADOC took decisive action when it became clear COVID-19 would spread to the United States. ADOC educated persons living and working within ADOC facilities about COVID-19. For example, ADOC posted information about COVID-19, including documents from OHS and CDC, identifying signs and symptoms of COVID-19, providing directions for a person with signs and symptoms of COVID-19, describing proper hygiene and other preventative practices, and identifying ways to address stress associated with COVID-19 throughout ADOC facilities (including Red Eagle). ADOC also distributed this same information directly to staff and inmates. A true and correct copy of the OHS and CDC informational documents regarding COVID-19 are attached as **Exhibit 2**.

Similarly, consistent with the CDC Guidance ADOC stopped accepting new intakes and completely shut down its facilities to all outside visitors to avoid these activities as a source of COVID-19 introduction and spread within the ADOC system during the pandemic. ADOC Commissioner Jefferson Dunn issued a moratorium on March 20, 2020, ceasing the new intake of state inmates into the ADOC system for at least a thirty (30) day period, except for state inmates with severe medical conditions approved by ADOC's OHS, including me, on a case-by-case basis.

For staff working in ADOC facilities, ADOC implemented the screening of staff as they arrived for work or when they called in sick. A pre-work screening consists of a temperature check and questionnaire. For staff who call in sick, ADOC created and maintains a tracking log and questionnaire to evaluate if and when a staff member may return to an ADOC facility for work. A true and correct copy of the screening tools and log are attached as **Exhibit 3**.

ADOC provided the CDC guidelines for cleaning to facilities, including a cleaning check-list for the kitchen. A true and correct copy of a facility kitchen checklist is attached as **Exhibit 4**. Since distributing these cleaning instructions, ADOC has reviewed compliance with these instructions at its facilities.

ADOC distributed facemasks to persons living and working in ADOC facilities and provided written instructions on the proper way to wear, store, remove, and clean the facemasks. ADOC required inmates to acknowledge, in writing, the acceptance or rejection of the facemasks and written instructions. A true and correct copy of the written instructions and acknowledgement form are attached as **Exhibit 5**.

During the 30-day moratorium on new intakes, ADOC developed a pilot program for the controlled restart of the intake process. ADOC began

implementation of its pilot program on April 21, 2020, for inmates with security levels 1-4 (i.e., no maximum-security inmates). To protect the existing inmate population, ADOC reinstituted the intake process for male inmates at Draper Correctional Facility ("Draper") and for female inmates at a satellite facility established in proximity to the Julia Tutwiler Prison for Women ("Tutwiler").

Consistent with CDC Guidance, during the pilot program, ADOC quarantines new intakes at Draper and Tutwiler for fourteen (14) days before transferring them to Kilby Correctional Facility ("Kilby") or Tutwiler to complete the intake process, assuming an inmate does not show signs or symptoms of COVID-19 or test positive for COVID-19. Because of the limited space at Draper and Tutwiler, ADOC can receive no more than one hundred twenty (120) new intakes every fourteen (14) days. To qualify for intake into the ADOC system under the pilot program, the sending county facility is asked to represent (among other things) that the new intake is not symptomatic of COVID-19, no inmate in the sending facility tested positive for COVID-19 in the fourteen (14) days preceding the transfer date, and the sending facility and inmate are not currently under quarantine due to a COVID-19 outbreak. At the conclusion of the pilot program, ADOC will consider continuing, changing, or terminating the pilot program, depending on the conclusions reached from the pilot program and the continued availability of PPE. Even if the pilot program continues, because of the uncertainty associated with the current and any future COVID-19 or other pandemic and the lack of an existing treatment for COVID-19, ADOC may have to reinstitute the moratorium on intakes from county jails in the future.

ADOC inmates have received, and continue to receive, appropriate medical care as it relates to the prevention and management of COVID-19 and do not face the same threat posed to the public by COVID-19. ADOC's and its medical contractor's staff have worked, and continue to work, tirelessly to prevent the introduction and spread of COVID-19 throughout the ADOC system. As of June 10, 2020, ADOC has had 28 inmates who have tested positive since March 18, 2020. None of the inmates testing positive for COVID-19 were located, or had been housed, at Red Eagle since the introduction of COVID-19 to the United States. It is noteworthy that the inmates within ADOC custody who have tested positive for COVID-19 did so after frequent or lengthy hospital visits. ADOC implemented strict limitations on the movement of inmates into and out of its facilities to help combat the spread of the virus, but also to conserve necessary medical capacity.

As Associate Commissioner for Health Services, I participated in and oversaw, and continue to participate in and oversee, the preparation, prevention, and management efforts associated with COVID-19 within the

ADOC system.  At Red Eagle (as well  as ADOC's other  facilities), ADOC and  Wexford  have  taken  the  following  prevention  and  management measures:

a.  educating  inmates  and  staff  through  oral  and  written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  encouraging  inmates  and  staff  to  engage  in  proper  hygiene practices and social distancing;

c.  providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;

d.  continuing medical appointments such as chronic care clinics and sick-call appointments;

e.  suspending copays for inmates seeking medical services;

f.  implementing intensified cleaning and disinfecting procedures;

g.  suspending  the  intake  of  new  inmates  and,  when  restarted, ensuring an appropriate quarantine and screening before transferring the  new  intakes  from  a  temporary  intake  facility  to  a  permanent intake facility, as noted above;

h.  performing  verbal  screening  and  temperature  checks  for  all persons  entering  the  facility  as  recommended  by  CDC  facility [guideline];

i.  implementing social distancing strategies;

j.  providing a minimum of two (2) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;

k.  providing  masks and gloves to administrative  and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l.  providing  a  supplemental  supply  of  personal  protective equipment, including masks and gloves, gowns, and face shield to medical and mental-health staff;

m. implementing a quarantine or medical isolation plan for any inmate who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19; and

n.  monitoring inmates for symptoms of COVID-19 [such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell].

ADOC and Wexford, including me, continue to evaluate the COVID-19 prevention and management measures. We will modify our management measures should it become necessary in accordance with any modifications

or new recommendations published by the CDC and/or the Alabama
Department of Public Health recommendations.

Doc. 29-1 at 2–10 (paragraph numbering and footnote omitted).

Charles Tipton, a warden at Red Eagle, filed a declaration in which he echoes the
measures undertaken by the ADOC and its healthcare provider in their efforts to prevent
or stem the spread of COVID-19 in the prison system set forth in Naglich's declaration and
avers that these measures have been undertaken at Red Eagle. Doc. 29-2 at 2–3 ("The
ADOC staff at Red Eagle have undertaken significant and on-going COVID-19 prevention
and management efforts. As Warden, I participated in and oversaw, and continue to
participate in and oversee, the preparation, prevention, and management efforts associated
with COVID-19 at Red Eagle, including, the . . . prevention and management measures
initiated by ADOC and its healthcare vendor, Wexford Health Sources, Inc.
("Wexford")[.]"). In addition to each of the measures listed in Naglich's declaration,
Tipton states that inmates at Red Eagle "with symptoms of COVID-19 or contact with a
person testing positive for or suspected of having COVID-19" are tested for the virus. Doc.
29-2 at 4. Regarding the temperature and symptom checks performed on persons entering
Red Eagle, Tipton advises "if a person has a temperature over 100.4 degrees Fahrenheit or
other symptoms of COVID-19" the individual is denied "entry into the facility." Doc. 29-
2 at 3. Tipton further provides:

> I along with other personnel within ADOC and Wexford continue to
> evaluate the COVID-19 prevention and management measures at Red Eagle.
> We will implement new or different prevention and management measures
> at Red Eagle if and when necessary and consistent with CDC and other
> guidance. Plaintiff's unsubstantiated and untrue complaints aside, through

the tireless efforts of the administrative, correctional, medical, and mental-health staff at Red Eagle, there has not been a single inmate at Red Eagle test positive for COVID-19 as of June 10, 2020.

To elaborate on the cleaning mentioned . . . above, all surfaces, including bathroom and living areas, are cleaned and sanitized with approved disinfectants at a minimum of twice per shift, for a total of no less than six (6) times per day.

We have implemented social distancing policies recommended by the CDC to mitigate the spread of the virus. These measures include requiring all inmates wear masks and to keep at least six (6) feet distance from one another while standing in line for meals, phones or any other matter. All inmates were provided two (2) masks and instructions on use and cleaning. Plaintiff received, and signed for, his masks on April 23, 2020. A copy of the signed Acknowledgement form is attached as Exhibit 1.

Additionally, as of March 13, 2020, all outside work in the community has been suspended, all visitation has been suspended, congregational services have been suspended, and no religious or educational personnel are allowed inside the facility. We have absolutely minimized the contact with anyone from outside the facility.

The staff at Red Eagle continues to provide services and security for all inmates while pursuing COVID-19 mitigation procedures. Any inmate who is ill or becomes ill is treated by medical professionals as soon as possible.

Doc. 29-2 at 4–5 (paragraph numbering omitted).

Finally, with respect to Dixon's health condition as is relevant to his susceptibility to COVID-19 and his concerns presented in the complaint, Dr. Wilcotte Rahming, the Medical Director for Red Eagle, provided the following information:

. . . . In preparing this declaration, I have evaluated the medical records and movement history of the Plaintiff, Darryl Lynn Dixon, and the Motion for Preliminary Injunction (Doc. #1) to understand Plaintiff's complaints in this action. It is my understanding from reading Plaintiff's Complaint that he is concerned about exposure to the novel coronavirus disease 2019 (COVID-19) and concerned with the prevention and management of COVID-19 at Red Eagle. I can say, unequivocally, after reading Plaintiff's Complaint that he is misinformed about, and has misrepresented to the Court, his purported exposure to COVID-19 and the prevention and management of COVID-19 at Red Eagle.   Through the

tireless efforts of the administrative, correctional, medical, and mental-health staff at Red Eagle, there has not been a single inmate at Red Eagle test positive for COVID-19 as of June 10, 2020.

To my knowledge Plaintiff has not been exposed to COVID-19.

Plaintiff is not a person at high risk for severe illness from COVID-19. The Centers for Disease Control and Prevention of an operating division of the U.S. Department of Health & Human Services ("CDC"), has identified persons at higher risk of severe illness from COVID-19 based on currently available information and clinical expertise; persons at high-risk for severe illness from COVID-19 include persons over sixty-five (65) years of age or with serious underlying medical conditions such as chronic lung disease, serious heart conditions, immunocompromised, severe obesity, diabetes, chronic kidney disease undergoing dialysis, and liver disease. . . .  Plaintiff is not sixty-five (65) years or older, and he does not have a CDC-recognized serious underlying medical condition potentially creating a higher risk for severe illness from COVID-19. Plaintiff therefore is not a person at high risk for severe illness from COVID-19.

As the Medical Director at Kilby and Red Eagle, I have participated in and continue to participate in and oversee, the preparation, prevention, and management efforts associated with COVID-19. At Red Eagle (as well as ADOC's other facilities), ADOC and Wexford have taken the . . . prevention and management measures [previously referenced herein].

. . . .

ADOC and Wexford, including me, continue to evaluate the COVID-19 prevention and management measures. We will implement new or different prevention and management measures if and when necessary and consistent with CDC and other guidance.

ADOC inmates have received, and continue to receive, appropriate medical care as it relates to the prevention and management of COVID-19 and do not face the same threat posed to the public by COVID-19. Plaintiff has neither submitted a sick-call request related to COVID-19 nor grieved the denial of any medical services related to COVID-19.  Sick-call requests are triaged and addressed in a timely manner based upon the urgent, emergent, or routine nature of the sick-call request at Red Eagle.

Red Eagle, like other ADOC facilities, provides inmates with a formal process for filing medical grievances. Exhausting the grievance process involves an inmate filing a grievance and, if dissatisfied with the initial response, an appeal. . . .

. . . .

Again, Plaintiff has not filed a grievance related to COVID-19.

Currently, Plaintiff is neither a high priority nor a priority for COVID-19 testing under the CDC guidance. Moreover, Plaintiff is not a person with

symptoms of COVID-19. From a clinical perspective, Plaintiff is not at risk of contracting COVID-19 or any problems associated with COVID-19. Nevertheless, if Plaintiff or any other inmate at Red Eagle becomes symptomatic or a priority for testing, then Plaintiff or such other inmate will be tested and, for inmates testing positive for COVID-19, they will be medically isolated and their healthcare managed appropriately. That is, and has been, the practice at Red Eagle and other ADOC facilities.

Doc. 29-3 at 2–7 (paragraph numbering omitted).[4]

## D. Preliminary Injunction – Requisite Elements

"The grant or denial of a preliminary injunction rests within the sound discretion of the district court." *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1163 (11th Cir. 2018); *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (same). This court may grant a preliminary injunction only if the plaintiff demonstrates each of the following requisite elements: (1) a substantial likelihood of success on the merits; (2) an irreparable injury will occur absent issuance of the injunction; (3) the injunction would not substantially harm the non-moving parties; and (4) if issued, the injunction would not be adverse to the public interest. *Long v. Sec'y Dept. of Corrections*, 924 F.3d 1171, 1176 (11th Cir. 2019); *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983). "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the

---

[4] The grievance procedure referenced by Dr. Rahming only provides redress for inmates with regard to matters involving medical treatment provided by the ADOC's health care provider and its employees.

four requisites." *McDonald's*, 147 F.3d at 1306 (internal quotations omitted); *Wreal LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations and citation omitted) ("A preliminary injunction is an extraordinary and drastic remedy, and [Plaintiff] bears the burden of persuasion to clearly establish all four of these prerequisites."); *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion on each of the requisite elements).

## E.  Deliberate Indifference – Standard of Review

Dixon contends the defendants have acted with deliberate indifference to his health and safety because as an inmate he is unable to "adher[e] to the warnings, mandates, orders, etc. imposed upon or recommended to the public [by health officials] to protect [himself] from the substantial harm and possible death from COVID-19."  Doc. 1 at 12–13.

Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain.  *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement."  *Id*. at 348 (citation omitted).  Prison conditions which may be "restrictive and even harsh . . . are part of the

penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. at 347. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46; *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. A prison official may therefore be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. To demonstrate an Eighth Amendment violation regarding conditions, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to

demonstrate an Eighth Amendment violation).  With respect to the requisite objective

element, an inmate must first show "an objectively substantial risk of serious harm . . .

exists.  Second, once it is established that the official is aware of this substantial risk, the

official must react to this risk in an objectively unreasonable manner."  *Marsh v. Butler*

*Cnty., Ala*., 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  As to the subjective element, "the official

must both be aware of facts from which the inference could be drawn that a substantial risk

of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837–38;

*Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838).

In sum,

> [u]nder the objective component, the plaintiff must demonstrate "a
> substantial risk of serious harm." [*Farmer*, 511 at 834]. Here, ..., we think—
> that the risk of COVID-19 satisfies this requirement. Under the subjective
> component, the plaintiff must prove "the defendants' deliberate indifference"
> to that risk of harm by making three sub-showings: "(1) subjective
> knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct
> that is more than mere negligence." *Lane* [*v. Philbin*, 835 F.3d 1302, 1308
> (11th Cir. 2016)], (quotation omitted). Helpfully, the defendants seem not to
> dispute that they had "subjective knowledge" of the risk that the virus poses.
> The inquiry here thus hinges on whether the defendants "disregard[ed]" the
> risk "by conduct that is more than mere negligence," *id*. (quotation
> omitted)—or more simply stated, whether they "recklessly disregard[ed] that
> risk," *Farmer,* 511 U.S. at 836, 114 S.Ct. 1970.

*Swain*, 2020 WL 3167628, at *5; *King v. Fairman*, 997 F.2d 259, 261 (7th Cir. 1993)

(internal quotations  and citations omitted) ("To sustain his constitutional claim, the inmate

must demonstrate something approaching a total unconcern for his welfare in the face of

serious risks, or a conscious, culpable refusal to prevent harm.").

The Eleventh Circuit,

(echoing the Supreme Court) ha[s] been at pains to emphasize that "the deliberate indifference standard ... is far more onerous than normal tort-based standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40, 114 S. Ct. 1970; *see also id.* at 835, 114 S. Ct. 1970 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

*Swain*, 2020 WL 3167628, at *7.

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .   It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "The requisite mental state for prison officials is intent, or its functional equivalent, described as deliberate indifference[.]"  *King*, 997 F.2d at 261 (internal quotations and citations omitted).  "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'"  *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh*, 268 F.3d at 1028); *Lane*, 835 F.3d at 1307 (11th Cir. 2016) (holding that the Eighth Amendment is violated only when a correctional official "is

deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury.").  The Eleventh Circuit has consistently held that "'[i]n order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the [mere] tort to a constitutional stature.'"  *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting *Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir. 1981), *cert. denied*, 464 U.S. 932 (1983); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (same).

> As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar. A plaintiff must prove that the defendant acted with "a sufficiently culpable state of mind." [*Farmer*, 511 U.S.] at 834, 114 S. Ct. 1970 (quotation omitted). Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law." *Id.* at 839–40, 114 S. Ct. 1970. Indeed, even where "prison officials ... actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted." *Id.* at 844, 114 S. Ct. 1970. This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844–45, 114 S. Ct. 1970 (quotations and internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates...." (quotation omitted)).

*Swain*, 2020 WL 3167628, at *5.

## F.  The Request for Preliminary Injunctive Relief

Dixon seeks issuance of a preliminary injunction ordering the mass release of inmates meeting any one of numerous criteria he lists as justifying release.  Doc. 1 at 14–

17.[5] Dixon asserts that release "from these potential 'breeding grounds for the virus' which has proven to be deadly" is necessary to ensure he and other innates are not exposed to COVID-19.  Doc. 1 at 14.  Upon review of the record before the court and looking at the measures undertaken by correctional officials, the undersigned finds that Dixon has failed to meet his burden of establishing each requisite element necessary for issuance of the requested preliminary injunction.  *See Swain*, 2020 WL 3167628, at *8 (finding that a district court in addressing a request for preliminary injunctive relief must look to what the defendants "*did* . . . do[.]") (emphasis in original).

Initially, the court finds that in accordance with the Guidelines issued by the CDC the ADOC has undertaken numerous measures at Red Eagle to prevent and mitigate the

---

[5] The Prison Litigation Reform Act references release as potential relief in civil actions filed by prisoners challenging prison conditions, 18 U.S.C. § 3626(a)(3)(A)(i)-(ii), but only when "a court  has  previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and the defendant has had a reasonable amount of time to comply with the previous court orders."  However, the Eleventh Circuit has held that "even if [a plaintiff] established a constitutional violation [regarding conditions], he would not be entitled to the relief he seeks because release from imprisonment is not an available remedy for a conditions-of-confinement claim." *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015) (citing *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) (holding that "[t]he appropriate Eleventh Circuit relief from prison conditions . . . is to require the discontinuation of any improper practices . . . [it] does not include release from confinement.")); *Sheley v. Dugger*, 824 F.2d 1551, 1559 (11th Cir. 1987) (holding that relief for an Eighth Amendment violation does not include release from confinement; *Cook v. Hanberry*, 596 F.2d 658, 660 (5th Cir. 1979) (acknowledging that even assuming prisoner could prove his claims of "cruel and unusual punishment, [he]  still would not be entitled to release from prison. The appropriate remedy would be to enjoin continuance of any practices or require correction of any conditions causing him cruel and unusual punishment.").  Moreover, the court notes that the relief sought by Dixon "– judicially-ordered release – has not been granted by other courts where the risk to detainees posed by COVID-19 is much more prevalent." *Archilla*, 2020 WL 2513648, at *19.  As explained herein, based on the record now before it, the court does not find that the preliminary injunctive relief sought by Dixon is appropriate at this time. Thus, the question of whether release may be afforded to an inmate based solely on claims challenging conditions of confinement is left for another time.

spread of COVID-19.  To date, these measures have been greatly successful as the evidence before the court shows that no inmate at Red Eagle has tested positive for COVID-19.  *See* Doc. 29-3 at 2.[6]  Nevertheless, even if an inmate subsequently tests positive for the virus at Red Eagle, the Eleventh Circuit has found that it is improper for a court to equate an increased rate of infection with deliberate indifference.  *Swain*, 2020 WL 3167628, at *7.

> On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id.* at 844, 114 S. Ct. 1970 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[ ] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, ––– F.3d –––, –––, 2020 WL 3056217, at *10 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

*Id.*  With respect to the main concern expressed by Dixon, i.e., the inability of the defendants to ensure that inmates practice proper social distancing at all times, the Eleventh Circuit stated "[f]ailing to do the 'impossible' doesn't evince indifference, let alone deliberate indifference."  *Id.*[7]  The court also stated that even if the defendants could not

---

[6] The public records of the Alabama Department of Corrections indicate that, as of June 23, 2020, no inmates or staff at Red Eagle have tested positive for COVID-19.  *See* www.doc.alabama.gov/covid19news.

[7] With respect to the guidance issued by the CDC, the Eleventh Circuit observed that:

> The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance at 1. Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." *Id.* at 11, 129 S. Ct. 365. It therefore offers "strategies with varying levels of intensity. . . ." *Id.*

enforce social distancing at all times any "alleged[] nonuniform enforcement of social distancing cannot alone constitute deliberate indifference." *Id*. at 9.

In addition to implementing strategies on social distancing for inmates, correctional officials have represented undertaking other measures to prevent the introduction and mitigate the spread of COVID-19 at Red Eagle.  These additional measures include:

- educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;
- encouraging inmates and staff to engage in proper hygiene practices and social distancing;
- providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;
- continuing medical appointments such as chronic care clinics and sick-call appointments;
- implementing intensified cleaning and disinfecting procedures;
- suspending the intake of new inmates;
- performing verbal screening and temperature checks for all persons entering the facility as recommended by CDC guideline and denying entry to those with certain high temperatures or symptoms of COVID-19;
- providing a minimum of two (2) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;
- providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;
- providing a supplemental supply of personal protective equipment, including masks and gloves, gowns, and face shield to medical and mental health staff;

---

*Swain*, 2020 WL 3167628, at *8.

- implementing a quarantine or medical isolation plan for any inmate who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;
- monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and
- testing inmates for COVID-19 with symptoms associated with COVID-19 or who have had contact with a person tested positive or who is suspected of having COVID-19.

*See* Doc. 29-1 at 9–10; Doc. 29-2 at 3–4; Doc. 29-3 at 3–5.

In this case, the court finds that the defendants' conduct does not show deliberate indifference. Specifically, there is nothing before the court which establishes "that the defendants acted with a deliberately indifferent mental state, equivalent to 'subjective recklessness as used in the criminal law.' *Farmer*, 511 U.S. at 839–40, 114 S. Ct. 1970." *Swain*, 2020 WL 3167628, at *8. Further, like the *Swain* court, this court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best' [when implementing and enforcing the measures set forth herein]. Because the defendants 'act[ed] reasonably,' they 'cannot be found liable' under the Eighth Amendment. *See* [*Farmer*, 511 U.S.] at 845, 114 S. Ct. 1970; *see also Williams*, ─── F.3d at ───, 2020 WL 3056217, at *7." *Swain*, 2020 WL 3167628, at *8. Consequently, under the present circumstances, it is clear that Dixon cannot show a substantial likelihood of success on the merits of his claims and his motion for preliminary injunction is therefore due to be denied for this reason alone. The court will, however, briefly address the

remaining elements necessary for issuance of a preliminary injunction—irreparable harm, balancing of the harms, and the public interest.

With respect to the second requisite element for issuance of a preliminary injunction, the court finds that Dixon has not demonstrated he will suffer irreparable injury absent the injunctive relief sought in this case.  "The inquiry isn't [simply] whether the plaintiff[] ha[s] shown that the virus poses a danger to the inmates in the abstract—it undoubtedly does—but rather whether [he] ha[s] shown that [he] will suffer irreparable injury 'unless the injunction issues.' *Jones v. Governor of Fla.*, 950 F.3d [795,] 806 [(11th Cir. 2020)]."  *Swain*, 2020 WL 3167628, at *11.  "'As [the Eleventh Circuit] ha[s] emphasized on many occasions, the asserted irreparable injury must be neither remote nor speculative, but actual and imminent.' *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted)."  *Swain*, 2020 WL 3167628, at *11.  To obtain preliminary injunctive relief, Dixon must therefore identify an injury that is actual and imminent, not remote or speculative.  *See Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Merely showing the "possibility" of irreparable harm is insufficient.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." ).

It is undisputed that incarceration "comes with its flaws. Even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases, such as the common cold or tuberculosis." *Matos v. Lopez Vega*, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020).  As previously determined, correctional officials "have made conscious efforts to create a safe environment for the [prisoners at Red Eagle] and [its] staff, despite inherent obstacles and the novel COVID-19 virus." *Id.*  COVID-19 is not yet present in the inmate population at this facility.  Thus, the court finds that Dixon has not shown anything more than his fear of possibly suffering an injury which is remote and speculative.

Finally, "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the court discerns that each of these factors weighs in favor of the defendants.

The public interest and that of the State in the enforcement of criminal laws and incarceration of those convicted of violating such laws are clearly significant. Additionally, "[n]othing in the record indicates that the defendants will abandon the current safety measures absent a preliminary injunction, especially since the defendants implemented many of those measures before the plaintiff[] even filed the complaint. . . . For that reason, the balance of harms weighs in the defendants' favor." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020), subsequent determination, *Swain v. Junior*, ⸺ F.3d ⸺, 2020 WL 3167628 (11th Cir. June 15, 2020); *see also Woodford v. Ngo*, 548 U.S. 81,

94 (2006) "[I]t is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'").   Moreover, the court finds that the mass release of inmates requested by Dixon would be adverse to both of these interests.

### III.  CONCLUSION

While the court understands the fear and concern expressed by Dixon regarding COVID-19, he has not shown the remedy he seeks—release—is appropriate.   An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements."  *CBS Broadcasting v. Echostar Communications Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted).  Dixon has failed to carry his burden of persuasion on any of the four requisite elements, much less all of them, as is required to establish entitlement to preliminary injunctive relief.  For the reasons discussed herein, the court concludes that the motion for preliminary injunction is due to be denied.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motion for preliminary injunction filed by the plaintiff be DENIED.

2.  This case be referred back to the undersigned Magistrate Judge for further appropriate proceedings.

On or before **July 13, 2020**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions contained

in the Recommendation to which his objection is made.  Frivolous, conclusive, or general objections will not be considered by the court.

Failure to file written objections to the proposed factual findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact [and law] and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 26th day of June, 2020.


/s/ Jerusha T. Adams
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE