IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DARRYL LYNN DIXON, #161637, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:20-CV-248-WHA |
| ) | |
| KAY IVEY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**[1]

Darryl Lynn Dixon, a state inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 action challenging the constitutionality of conditions at the Red Eagle Honor Farm ("Red Eagle").[2] In the instant complaint, Dixon alleges the conditions at Red Eagle are hazardous to his health due to the coronavirus pandemic, otherwise known as COVID-19, and his potential risk of exposure to the virus while incarcerated. Doc. 1 at 10 ("Being subjected to 'places where people are forced to be in close proximity' which 'are breeding grounds for the virus' which could possibly lead to death of inmates within the walls and confinement of the Alabama Department of Corrections is cruel and unusual."). Dixon

---

[1] All documents and attendant page numbers cited in this Recommendation are those assigned by the Clerk in the docketing process.

[2] Dixon is currently incarcerated on three convictions for first degree robbery entered against him in 2009 and the concurrent twenty year sentences imposed upon him for these convictions by the circuit courts of Shelby and Jefferson counties.

further alleges the defendants have acted with deliberate indifference to his health and safety during the pandemic because they have not implemented all the measures recommended by health officials to stem the spread of the highly contagious virus and cannot do so in the prison environment. Doc. 1 at 12–13 ("Inmates incarcerated within the confines of the facilities of the Alabama Department of Corrections are unwillingly restricted from adhering to the warnings, mandates, orders, etc. imposed upon or recommended to the public [by various health officials] to protect us from the substantial harm and possible death from COVID-19."). In support of his allegations, Dixon references the fact that inmates are "'forced to be in close proximity' within the confinement of the Alabama Department of Corrections[.]" Doc. 1 at 13–14.

On August 20, 2020, Dixon filed a document, Doc. 50, which the court construed to contain a motion for preliminary injunction. Doc. 51. In this motion for preliminary injunction, Dixon requests issuance of preliminary injunctive relief which enjoins correctional officials from assigning inmates to off-site work assignments until there is a cure or vaccine for the coronavirus or until the virus is no longer a threat to society and prohibits any adverse action against an inmate who refuses such an assignment. Doc. 50 at 2. Based on the foregoing, the court issued an order directing the necessary defendants to file a response and supplement thereto to the motion for preliminary injunction presently before the court, and they have done so.

Upon consideration of the motion for preliminary injunction contained in Doc. 50, and after thorough review of the responses thereto, including supporting evidentiary

materials, filed by defendants Alabama Department of Corrections, Kay Ivey, Charles Tipton and Jefferson S. Dunn, the undersigned finds that such motion is due to be denied.

## II.  DISCUSSION

The court set forth a synopsis of COVID-19 and detailed discussions explaining both the response of the Centers for Disease Control and Prevention ("CDC") and the response of the Alabama Department of Corrections ("ADOC") to COVID-19 in a prior Recommendation entered on June 26, 2020, Doc. 30 at 3–11, addressing a motion for preliminary injunction filed by Dixon upon initiation of the complaint.  The District Judge adopted the Recommendation as the opinion of the court on August 17, 2020.  Doc. 47.  The court adopts its prior synopsis regarding COVID-19 and the discussions as to the responses undertaken by the CDC and ADOC with respect to the pandemic and, therefore, finds it unnecessary to repeat such in this Recommendation.

**A.  Defendants' Responses to the Pending Motion for Preliminary Injunction**

In their responses to the pending motion for preliminary injunction, the relevant defendants argue that preliminary injunctive relief is not warranted regarding off-site work assignments.  Charles Tipton, a warden at Red Eagle, filed a properly sworn declaration in which he states:

> The ADOC staff at Red Eagle continue to be vigilant in their efforts to prevent and manage the spread of COVID-19, and as of the date of this declaration, no inmates or staff have tested positive for COVID-19.
>
> With respect to Dixon's most recent concerns about off-site work, any inmate sent to a minimum facility [such as Red Eagle] technically is required to be able and willing to work.  Most inmates are informed on arrival that if they are assigned a job, whether inside or outside the institution, they must report for

work unless they are ill, injured, on a medical profile, are disqualified by a documented disability, or stopped up by order of staff. Any medical "stop-up" (medical excuse from working) must be verified by medical personnel. Refusal to work is a valid disciplinary infraction, one which can lead to an inmate being sent back to a higher-level facility and reclassified from minimum to medium custody. The general rule is two disciplinary infractions for refusal to work [may result in a] request [for] transfer and reclassification. This must be approved by a Classification Analyst at Central Classifications. However, there may be exceptions to this depending on the inmate's past disciplinary history, work record and other variables. ADOC reserves the right to utilize this discipline if the inmate's conduct meets these guidelines and our local prison management and classification teams deem[] it appropriate to do so under the circumstances.

Inmate Toree Jones (AIS no. 268125) was assigned to go work at the ACI warehouse, but he refused stating concern over the risk of contracting COVID-19.[3] He was the only one of the inmates assigned to the ACI warehouse who refused to work. After I conferred with Jones's security supervisor, Inmate Jones was not disciplined for this infraction, although ADOC reserves the right to do so in the future for refusing to work.

Contractors/employers using Red Eagle inmates must provide assurance that they will enforce all COVID-19 precautions. Since Red Eagle [is] a level II camp, the only employers/contractors that inmates from here would be assigned to work for would be government entities or agencies—usually state, county, or municipal governments or a division thereof. These inmates would be supervised by a government employee.

The contractor/employer that Inmate Jones was assigned to work for was the ACI division (Alabama Correctional Industries) of the Alabama Department of Corrections. Inmates employed by ACI perform manual labor such as moving equipment and furniture, cleaning, painting and general maintenance. The only contact they have is with ACI employees on the jobsite. All COVID-19 precautions are being taken at the workplace, to include social distancing, wearing masks, and disinfecting surfaces. We do not have any inmates working anywhere other than ADOC property.

Red Eagle inmates are currently employed only to work [] in [the] following locations (for ADOC employers): ACI warehouse, Tutwiler work squad, and

---

[3] Inmate Jones provided a declaration which Dixon submitted in support of his motion for preliminary injunction. *See* Doc. 50-1.

>Draper work squad. These squads do not have contact with other inmates from these facilities, and only limited contact with ADOC employees. They perform manual labor that can range from lawn care to painting to moving furniture or equipment.

Doc. 58-1 at 2–4 (paragraph numbering omitted and footnote added).

>In a subsequent declaration, Warden Tipton further explains:

>The policies and practices at Red Eagle continue to prove effective as Red Eagle continues to remain COVID-19 free. To date, no inmate or officer has tested positive for the virus. Since March 2020, approximately fifteen (15) officers have self-quarantined following symptoms, but no officer has tested positive for the virus.

>The Pandemic Response Team continues to evaluate the policies and practices at Red Eagle, but currently the policies outlined in my previous declarations remain[] the same. The Pandemic Response Team includes myself; Dr. Rahming, Medical Director; Kimberly Griffin, Health Services Administrator; and the Regional Associate Director of Health Services position [which] is currently vacant. Additionally Captain Franetta Riley, Sergeant Andree Taylor, ADA Coordinator Catina Hyatt, and Nurse Practitioners Donald McArthur and Charlene McMullen assist the team.

>The policies and procedures developed by the Alabama Department of Corrections ("ADOC"), as detailed in my first declaration (Doc. No. 29-2), and implemented and reviewed by the Red Eagle Pandemic Response Team continue to prove successful. Following the protocols in place, we responded quickly to the potential exposure of four (4) inmates to a COVID-19 positive ADOC employee while on a work detail. The four (4) inmates assisted with a specific work detail on an ADOC building, on an ADOC site, and under ADOC supervision. On or about September 23, 2020, approximately four days after the work detail, we received information that one of the ADOC employee supervisor[s] tested positive for COVID-19. Responding to this information, we placed the four (4) inmates on Watchful Wait to monitor them for symptoms. The Chapel serves as the designated Watchful Wait location and allows for the removal of inmates from general population. Under Watchful Wait, medical staff conducted twice daily symptoms and temperature checks on the four (4) inmates. The inmates remained under Watchful Wait through September 29, 2020. No inmate developed any symptoms. As such, no other inmate at Red Eagle would have been exposed to the virus.

5

> Watchful Wait isolates inmates potentially exposed to a known COVID-19 positive individual from the general population for up to ten (10) days following exposure. This status requires all movement to be conducted separate from all other inmates, twice daily symptoms and temperature checks, restriction from work and visitation, masks worn at all times except when eating and sleeping, and prohibits isolated inmates from leaving the isolation area, including having meals delivered to the isolation area.
>
> The leadership at Red Eagle continue to use their best efforts to combat the spread of COVID-19 and utilize the same protocols outlined in my four previous declarations. These efforts, so far, have proven to be successful as no inmate or staff member has tested positive for the virus. Intake for Red Eagle continues to be suspended, and as a result the population has reduced to 224 inmates. Additionally, off-site work details continue to be restricted to only ADOC facilities or properties with supervision by ADOC personnel, and then only with permission from the Deputy Commissioner for Operations approval. No work details deploy to work assignments outside of ADOC property.

Doc. 75-4 at 3–5 (paragraph numbering omitted).

The policies and procedures adopted by correctional officials to combat the spread of COVID-19 referenced by defendant Tipton in his latter declaration are set forth in the prior Recommendation addressing Dixon's initial motion for preliminary injunction and appear as follows:

> In addition to implementing strategies on social distancing for inmates, correctional officials have represented undertaking other measures to prevent the introduction and mitigate the spread of COVID-19 at Red Eagle. These additional measures include:
> - educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;
> - encouraging inmates and staff to engage in proper hygiene practices and social distancing;
> - providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;

6

- continuing medical appointments such as chronic care clinics and sick-call appointments;
- implementing intensified cleaning and disinfecting procedures;
- suspending the intake of new inmates;
- performing verbal screening and temperature checks for all persons entering the facility as recommended by CDC guideline and denying entry to those with certain high temperatures or symptoms of COVID-19;
- providing a minimum of two (2) masks to each inmate, along with instructions on wearing, cleaning, and caring for the masks;
- providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;
- providing a supplemental supply of personal protective equipment, including masks and gloves, gowns, and face shield to medical and mental health staff;
- implementing a quarantine or medical isolation plan for any inmate who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;
- monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and
- testing inmates for COVID-19 with symptoms associated with COVID-19 or who have had contact with a person tested positive or who is suspected of having COVID-19.

*See* Doc. 29-1 at 9–10; Doc. 29-2 at 3–4; Doc. 29-3 at 3–5.

Doc. 30 at 21–22.

Finally, with respect to Dixon's health conditions as they are relevant to his susceptibility to COVID-19 and his concerns regarding a possible off-site work assignment expressed in the pending motion for preliminary injunction, Dr. Wilcotte Rahming, the Medical Director for Red Eagle, submitted properly sworn declarations addressing these concerns. After a thorough and exhaustive review of the medical records submitted in this

case, the court finds that the details of Dixon's conditions as set forth by Dr. Rahming in his declarations are corroborated by the objective medical records contemporaneously compiled during Dixon's incarceration.

In his October 23, 2020 declaration, Dr. Rahming provides the following information:

> Mr. Dixon has hypertension for which he receives appropriate medications. Mr. Dixon also has mild chronic kidney disease (prediabetes) that has been stable over the last seven (7) years.
>
> Mr. Dixon is regularly monitored for his chronic care medical conditions.
>
> Mr. Dixon developed a fever on January 14, 2020 and was sent to Jackson Hospital in Montgomery, Alabama, where he was screened for the flu. Mr. Dixon tested negative for the flu and was returned to Red Eagle. The next day he was afebrile.
>
> Mr. Dixon was not tested for Covid [sic] either at Jackson Hospital or Red Eagle in January of 2020.
>
> Mr. Dixon has remained asymptomatic since January 15, 2020.
>
> I have reviewed Mr. Dixon's lab work from July 22, 2020. The lab results do not suggest that Mr. Dixon is at high risk to contract COVID-19 or to suffer from severe illness were he to contract COVID-19. The July 22, 2020 lab results, from a medical perspective, should not impact any decisions regarding any placement of Mr. Dixon on off-site work assignments.

Doc. 75-1 at 2 (paragraph numbering omitted).

In a subsequent declaration, Dr. Rahming states:

> I am aware that Mr. Dixon has made allegations that four (4) inmates were quarantined in the Red Eagle Chapel on September 23, due to COVID-19 concerns.
>
> Four inmates were isolated at the Red Eagle camp due to the fact that they were potentially exposed to an individual who was not an inmate at Red

> Eagle that had tested positive [for] COVID-19. The four inmates were the only inmates at Red Eagle that were potentially exposed to the individual that had tested positive for COVID-19. None of the four inmates ever showed any signs or symptoms of COVID-19 and they were only isolated as a precaution.
>
> Due to the fact that none of the four inmates ever showed any signs or symptoms of COVID-19, they were not tested. There was no medical reason to test the inmates as they never showed any positive signs of COVID-19.
>
> The inmates were released from isolation [o]n September 30, 2020.
>
> Inmates have been educated as to the signs and symptoms of COVID-19, precautions to take, and what steps to take it [sic] they show signs or symptoms of COVID-19.
>
> Inmates incarcerated at the Red Eagle camp are not routinely tested if they show no signs or symptoms of COVID-19.
>
> Only inmates that have positive signs or symptoms of COVID-19 are tested for the virus. The test has to be ordered by the medical provider.
>
> As of this date, October 22, 2020, there are zero inmates that have currently tested positive for COVID-19 incarcerated at the Red Eagle Camp.
>
> To this date no inmates have been tested for COVID-19 that have been incarcerated at the Red Eagle Camp.
>
> One inmate was transferred to Kilby from Red Eagle for possible COVID-19 symptoms. The inmate tested negative on June 26, 2020.

Doc. 75-2 at 1–2 (paragraph numbering omitted).

**B.  Preliminary Injunction – Requisite Elements**

"The grant or denial of a preliminary injunction rests within the sound discretion of the district court." *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1163 (11th Cir. 2018); *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (same).  This court may grant a preliminary injunction only if the plaintiff demonstrates

9

each of the following requisite elements: (1) a substantial likelihood of success on the merits; (2) an irreparable injury will occur absent issuance of the injunction; (3) the injunction would not substantially harm the non-moving parties; and (4) if issued, the injunction would not be adverse to the public interest. *Long v. Sec'y Dept. of Corrections*, 924 F.3d 1171, 1176 (11th Cir. 2019); *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983). "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's*, 147 F.3d at 1306 (internal quotations omitted); *Wreal LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) (internal quotations and citation omitted) ("A preliminary injunction is an extraordinary and drastic remedy, and [Plaintiff] bears the burden of persuasion to clearly establish all four of these prerequisites."); *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and the movant must clearly carry the burden of persuasion on each of the requisite elements).

## C. Deliberate Indifference – Standard of Review

Dixon contends the defendants should be enjoined from sending him to an off-site work assignment because to do so would, in essence, constitute deliberate indifference to

his health and safety due to the COVID-19 pandemic. Dixon further requests that the defendants be prohibited from taking any adverse action against him, e.g., issuance of a disciplinary or behavior citation, a change in his custody level or assignment to a different correctional facility, for his refusal of such an assignment until there is a cure or vaccination for COVID-19 or it is no longer a threat to society. Doc. 50 at 2.

Only actions that deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes actions which result in subjecting an inmate to conditions that involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions which may be "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. at 347. Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46; *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349). Thus, it is well-settled that the conditions under which a prisoner is confined or assigned to work during his confinement are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eighth Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. A prison official may therefore be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. To demonstrate an Eighth Amendment violation, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). With respect to the requisite objective element, an inmate must first show "an objectively substantial risk of serious harm . . . exists. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). As to the subjective element, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837–38; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838).

In sum,

> [u]nder the objective component, the plaintiff must demonstrate "a substantial risk of serious harm." [*Farmer*, 511 at 834]. . . . Under the subjective component, the plaintiff must prove "the defendants' deliberate indifference" to that risk of harm by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Lane* [*v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016)], (quotation omitted). . . . The [relevant] inquiry . . . [is] whether the defendants "disregard[ed]" the risk "by conduct that is more than mere negligence," *id.* (quotation omitted)—or more simply stated, whether they "recklessly disregard[ed] that risk," *Farmer,* 511 U.S. at 836, 114 S. Ct. 1970.

*Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020); *King v. Fairman*, 997 F.2d 259, 261 (7th Cir. 1993) (internal quotations and citations omitted) ("To sustain his constitutional claim, the inmate must demonstrate something approaching a total unconcern for his welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm.").

The Eleventh Circuit,

> (echoing the Supreme Court) ha[s] been at pains to emphasize that "the deliberate indifference standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013), and is in fact akin to "subjective recklessness as used in the criminal law," *Farmer*, 511 U.S. at 839–40, 114 S. Ct. 1970; *see also id.* at 835, 114 S. Ct. 1970 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."). Were we to accept the district court's determination that resulting harm, the failure to take impossible measures, or even the combination of both suffices to show a criminally (and thus constitutionally) reckless mental state, "the deliberate indifference standard would be silently metamorphosed into a font of tort law—a brand of negligence redux—which the Supreme Court has made abundantly clear it is not." *Goodman*, 718 F.3d at 1334.

*Swain*, 961 F.3d at 1288.

13

The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "The requisite mental state for prison officials is intent, or its functional equivalent, described as deliberate indifference[.]" *King*, 997 F.2d at 261 (internal quotations and citations omitted). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh*, 268 F.3d at 1028); *Lane*, 835 F.3d at 1307 (11th Cir. 2016) (holding that the Eighth Amendment is violated only when a correctional official "is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury"). The Eleventh Circuit has consistently held that "'[i]n order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the [mere] tort to a constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (quoting *Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir. 1981), *cert. denied*, 464 U.S. 932 (1983); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (same).

> As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar. A plaintiff must prove that the defendant acted

> with "a sufficiently culpable state of mind." [*Farmer*, 511 U.S.] at 834, 114 S. Ct. 1970 (quotation omitted). Ordinary malpractice or simple negligence won't do; instead, the plaintiff must show "subjective recklessness as used in the criminal law." *Id.* at 839–40, 114 S. Ct. 1970. Indeed, even where "prison officials . . . actually knew of a substantial risk to inmate health or safety," they may nonetheless "be found free from liability if they responded reasonably to the risk"—and, importantly for present purposes, "even if the harm ultimately was not averted." *Id.* at 844, 114 S. Ct. 1970. This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Id.* at 844–45, 114 S. Ct. 1970 (quotations and internal citations omitted); *see also Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) ("It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates. . . ." (quotation omitted)).

*Swain*, 961 F.3d at 1285–86.

### D.  The Request for Preliminary Injunctive Relief

Dixon seeks issuance of a preliminary injunction which enjoins his assignment to an off-site work detail and, if he refuses such assignment, prohibits any adverse action for his refusal, including a change in his custody status or place of confinement.  Doc. 50 at 2.  Upon review of the record before the court, the court finds that Dixon has failed to meet his burden of establishing each requisite element necessary for issuance of the requested preliminary injunction.

Initially, after review of the entire record in this case, the court finds that in accordance with the Guidelines issued by the CDC the ADOC has undertaken numerous measures to prevent and mitigate the spread of COVID-19.  To date, these measures have been greatly successful at Red Eagle as the evidence before the court shows that no inmate

15

at Red Eagle has been diagnosed with COVID-19. *See* Doc.75-2 at 2 & Doc 75-4 at 4.[4] Nevertheless, even if an inmate subsequently tests positive for the virus at Red Eagle, the Eleventh Circuit has found that it is improper for a court to equate an increased rate of infection with deliberate indifference. *Swain*, 961 F.3d at 1287.

> On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted.*" *Id.* at 844, 114 S. Ct. 1970 (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[ ] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 961 F.3d 829, 842–43 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

*Swain*, 961 F.3d at 1287.

In this case, the court finds that the defendants' conduct regarding the assignment of inmates to off-site work details does not show deliberate indifference. Specifically, there is nothing before the court which establishes "that [in utilizing off-site work assignments] the defendants act[] with a deliberately indifferent mental state, equivalent to 'subjective recklessness as used in the criminal law.' *Farmer*, 511 U.S. at 839–40, 114 S. Ct. 1970." *Swain*, 961 F.3d at 1289. Furthermore, "[b]ecause the defendants 'act[ed] reasonably,' they 'cannot be found liable' under the Eighth Amendment. *See* [*Farmer*, 511 U.S.] at 845, 114 S. Ct. 1970; *see also Williams*, 961 F.3d at 839–40." *Swain*, 961 F.3d at

---

[4]The public records of the Alabama Department of Corrections indicate that as of October 30, 2020 no inmates or staff at Red Eagle have tested positive for COVID-19. *See* www.doc.alabama.gov/covid19news.

1289.  Consequently, under the present circumstances, it is clear that Dixon cannot show a substantial likelihood of success on the merits and his motion for preliminary injunction is therefore due to be denied for this reason alone.  The court will, however, briefly address the remaining elements necessary for issuance of a preliminary injunction—irreparable harm, balancing of the harms, and the public interest.

With respect to the second requisite element for issuance of a preliminary injunction, the court finds that Dixon has not demonstrated he will suffer irreparable injury absent the injunctive relief sought in this case.  "[T]he inquiry isn't [simply] whether the plaintiff[] ha[s] shown that the virus poses a danger to [him] in the abstract—it undoubtedly does—but rather whether [he] ha[s] shown that [he] will suffer irreparable injury 'unless the injunction issues.'  *Jones v. Governor of Fla.*, 950 F.3d [795,] 806 [(11th Cir. 2020)]." *Swain*, 961 F.3d at 1292.  "'As [the Eleventh Circuit] ha[s] emphasized on many occasions, the asserted irreparable injury must be neither remote nor speculative, but actual and imminent.' *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation omitted)." *Swain*, 961 F.3d at 1292.  To obtain preliminary injunctive relief, Dixon must therefore identify an injury that is actual and imminent, not remote or speculative. *See Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Merely showing the "possibility" of irreparable harm is insufficient. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is

17

inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." ).

It is undisputed that incarceration "comes with its flaws. Even without a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases, such as the common cold or tuberculosis." *Matos v. Lopez Vega*, ___ F. Supp. 3d ___, ___, 2020 WL 2298775, at *10 (S.D. Fla. May 6, 2020). Correctional officials "have made conscious efforts to create a safe environment for the [prisoners at Red Eagle] and [its] staff, despite inherent obstacles and the novel COVID-19 virus." *Id.* COVID-19 is not yet present in the inmate population at this facility. Thus, the court finds that Dixon has not shown anything more than his fear of possibly suffering an injury which is remote and speculative.

Finally, "[t]he third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the court discerns that each of these factors weighs in favor of the defendants.

The public interest and that of the State in managing off-site work of inmates is clearly significant. Additionally, "[n]othing in the record indicates that the defendants will abandon the current safety measures absent a preliminary injunction, especially since the defendants implemented many of those measures before the plaintiff[] even filed the complaint. . . . For that reason, the balance of harms weighs in the defendants' favor." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020), subsequent determination, *Swain*

*v. Junior*, 961 F.3d 1276 (11th Cir. 2020); *see also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) "[I]t is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'"). Moreover, the court finds that allowing inmates to dictate if, when and where they are assigned off-site work details as requested by Dixon would be adverse to both of these interests.

### III. CONCLUSION

While the court understands the fear and concern expressed by Dixon regarding COVID-19, he has not shown the injunctive relief he seeks is appropriate. An injunction is "not to be granted unless the movant clearly establish[es] the burden of persuasion as to all four elements." *CBS Broadcasting v. Echostar Communications Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (internal quotations omitted). Dixon has failed to carry his burden of persuasion on any of the four requisite elements, much less all of them, as is required to establish entitlement to preliminary injunctive relief. For the reasons discussed herein, the court concludes that the motion for preliminary injunction is due to be denied.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff (Doc. 50) be DENIED.

2. This case be referred back to the undersigned Magistrate Judge for further appropriate proceedings.

On or before **December 1, 2020**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions contained in the Recommendation to which his objection is made. Frivolous, conclusive, or general objections will not be considered by the court.

Failure to file written objections to the proposed factual findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact [and law] and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 16th day of November, 2020.

/s/ Jerusha T. Adams
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE